ORIGINAL

Approved: *Andrea M. Griswold*
EUGENE INGOGLIA/ANDREA M. GRISWOLD
Assistant United States Attorneys

Before:  THE HONORABLE GABRIEL W. GORENSTEIN
         United States Magistrate Judge
         Southern District of New York



**14 MAG 2429**

------------------------------------X
UNITED STATES OF AMERICA            :    SEALED COMPLAINT

        - v -                       :    Violations of
                                         15 U.S.C. §§ 78j(b), 78ff;
                                    :    17 C.F.R. § 240.10b-5;
GREGORY RORKE,                      :    18 U.S.C. §§ 1343 & 2.

        Defendant.                  :    COUNTY OF OFFENSE:
                                         NEW YORK
                                    :
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss:

DOC # ____1____

ALEXANDER H. KURGANSKY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

### COUNT ONE
### (Securities Fraud)

1.   From at least in or about December 2009 through the present, in the Southern District of New York and elsewhere, GREGORY RORKE, the defendant, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, RORKE engaged in a scheme to defraud investors by making material misrepresentations, and distributing and causing to be distributed fraudulent and forged documents, to

existing investors and potential investors in connection with a convertible debt offering for a company controlled by Rorke.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5.)

## COUNT TWO
### (Wire Fraud)

2. From at least in or about December 2009 through the present, in the Southern District of New York and elsewhere, GREGORY RORKE, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, to wit, e-mails describing and attaching fraudulent financial and/or tax statements and e-mails to investors on various occasions, including to investors located in New York and in other states, writings, signs, signals, and sounds for the purpose of executing such scheme and artifice to defraud, to wit, RORKE engaged in a scheme to defraud investors by making material misrepresentations, and distributing and causing to be distributed fraudulent and forged documents, to existing investors and potential investors in a company controlled by Rorke, by interstate wire and other means.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I am a Special agent with the New York Office of the Federal Bureau of Investigation ("FBI") and I have been personally involved in the investigation of this matter. I have been a special agent with the FBI for approximately four-and-a half years. During this time, I have been responsible primarily for the investigation of offenses involving violations of the federal securities laws and related offenses. I have participated in numerous investigations of such offenses.

4. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, as indicated below. It is also based on my review of numerous documents, including, but not limited to, bank and brokerage account records, financial and tax-related

statements, investor and corporate documents, affidavits and e-mails and correspondence between GREGORY RORKE, the defendant, and investors, as well as communications between RORKE and agents acting on RORKE's behalf. It is also based on my review of sworn deposition testimony given by RORKE and others to the Securities and Exchange Commission ("SEC"). Furthermore, this Complaint is based on my interviews with several investors in the convertible debt offering for a company controlled by Rorke.

5. Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in sum and substance and in part unless indicated otherwise. Where figures and calculations are set forth, they are approximate.

**RELEVANT INDIVIDUALS AND ENTITIES**

6. Navagate, Inc. ("Navagate") is a privately-held software company, founded by GREGORY RORKE, the defendant, in or about 2006, with its principal place of business in New York, New York.

7. Navagate's self-proclaimed mission is to provide software solutions to assist financial services organizations to "standardize productive, yet informal work habits and automate time-consuming inter-departmental sales processes that inhibit face-to-face selling time, increasing organizational productivity and effectiveness." Navagate's primary product is a software solution called AGILITY™ Solution Suite.

8. At all relevant times, GREGORY RORKE, the defendant, a former adjunct professor at Columbia Business School, was the co-founder, Chief Executive, and principal owner of Navagate. RORKE solicited investments and was engaged in the daily management and operation of Navagate.

9. Middlebury Securities, LLC ("Middlebury") is a broker-dealer operated by Middlebury Group, LLC, with its principal place of business in Vermont and offices in New Jersey and Florida. In approximately 2009, Rorke utilized Middlebury as the placement agent for a convertible debt offering[1] (the "Navagate Offering"), as discussed more fully below.

---

[1] A convertible debt offering involves the issuance of bonds in which the bondholder has the option to convert the bonds into a company's equity at a future date. Here, investors in the

10. An individual not named herein ("Individual-1") was a Managing Partner at Middlebury in charge of the Navagate Offering and Rorke's primary contact at Middlebury.

11. In connection with Middlebury's role as a placement agent for the Navagate Offering, Middlebury utilized a transaction attorney not named herein (the "Middlebury Lawyer").

**OVERVIEW OF THE SCHEME TO DEFRAUD**

12. Based on my interviews with Navagate investors, my review of sworn deposition testimony given by GREGORY RORKE, the defendant, and others, to the SEC, and my review of various documents concerning Navagate, I have learned that from at least December 2009, RORKE solicited investor contributions to the Navagate Offering based on materially false and fraudulent misrepresentations. In particular, during the period relevant to this Complaint, RORKE made, among others, the following misrepresentations to investors:

a. RORKE signed a personal guarantee (the "Personal Guarantee") supported by a financial statement (the "Rorke Financial Statement"), which documents were provided to investors prior to their investment, reflecting that Rorke personally had at least twelve million dollars in assets, including more than one million dollars in cash, more than five million dollars of "readily marketable securities," and a home worth more than one million dollars, when in truth, and as RORKE well knew, the majority of the pledged assets did not belong to RORKE;

b. In order to obtain access to funds invested by Navagate investors and maintained in an escrow account controlled by Middlebury, RORKE signed a notarized affidavit indicating that RORKE had paid monies owed to the Internal Revenue Service ("IRS") in satisfaction of Navagate tax liabilities, when in truth, and as RORKE well knew, the tax liabilities had not been paid, remained outstanding, and were actually increasing; and

c. On or about November 28, 2012, after receiving multiple complaints from Navagate investors demanding repayment and/or threatening to sue RORKE, RORKE forwarded an email purporting to be from a representative of Hong Kong

---

Navagate Offering received warrants giving them a right to exchange their notes for Navagate stock at a discounted rate during a contemplated future public offering.

Shanghai Bank Corporation ("HSBC") which reflected that HSBC had just signed a multi-million dollar contract with Navagate when, in truth and in fact, and as RORKE well knew, the email was a fabrication.

13.  GREGORY RORKE, the defendant, made these and other misrepresentations to induce potential investors to invest in the Navagate Offering, to induce Middlebury to release investor funds held in escrow to RORKE, and to induce Navagate investors to forego note payments due to them from Navagate and/or not to bring suit against Navagate and RORKE. As a result of his fraudulent scheme, RORKE raised approximately $3 million in investor money from approximately 32 investors.[2]

**THE PERSONAL GUARANTEE**

RORKE SOLICITS INVESTMENTS IN NAVAGATE THROUGH A FRAUDULENT PERSONAL GUARANTEE

14.  Beginning from at least December 2009, GREGORY RORKE, the defendant, began to solicit investors in the Navagate Offering, offering them convertible debt in Navagate in exchange for their investment. RORKE utilized Middlebury as the placement agent[3] for the Navagate Offering, in which, from December 2009 through April 2011, approximately $3 million was raised from more than two dozen investors, each of whom invested between $25,000 and $500,000. Pursuant to the terms of the deal, Navagate investors were supposed to receive certain periodic interest payments and, later, an opportunity to convert their investment into equity in Navagate.

15.  From my investigation, including my review of e-mails sent by GREGORY RORKE, the defendant, to Individual-1, a Managing Partner at Middlebury, I have learned that RORKE communicated frequently with Individual-1 regarding the Navagate Offering. These communications included e-mails from RORKE to Individual-1 regarding information to be provided to potential and/or existing investors.

16.  In the course of soliciting investors, GREGORY RORKE, the defendant, and Middlebury, as placement agent acting

---

[2] Certain of the investors have been repaid, either directly by RORKE or as a result of civil lawsuits successfully brought against RORKE and/or Navagate.

[3] A placement agent is a firm that assists individuals and/or companies seeking to raise private financing.

-5-

on behalf of RORKE, provided potential investors in the Navagate Offering with subscription documents, which were provided to potential investors by, among other means, e-mail communication.

17. An exhibit to the subscription documents[4] contained the Personal Guarantee in which GREGORY RORKE, the defendant, "unconditionally guarantee[d] and promise[d] to pay promptly to the purchasers [investors] identified on the signature pages to the Subscription Agreement . . . any and all Indebtedness . . . of Borrower [RORKE] to each Purchaser [investor] when due . . . ." The subscription documents further provided as follows:

    a. The Personal Guarantee made clear that RORKE was pledging to use the assets set forth in the Rorke Financial Statement to secure the Personal Guarantee. The Rorke Financial Statement, which was signed by RORKE, reflects: (i) a net worth for RORKE of more than $12 million in assets, including $1 million in cash on hand or in banks, $5 million of "readily marketable securities," and a $1.4 million home/residence; and (ii) a list of the "readily marketable securities," which includes a "US Trust" account valued at $5 million.

    b. RORKE signed a Certification to the Rorke Financial Statement, which states:

> This is to certify that all the statements contained herein and in any supporting schedules are true and give correct showing of my financial condition as of the date indicated. I further certify that I had no liabilities, direct or contingent, business or accompanied, except as set forth in this statement, **_and that title to all assets therein set forth is in my name solely_**, except as may be otherwise noticed. In the event of any material adverse change in my financial condition, I agree to notify the financial institution named herein immediately in writing.

---

[4] Based on my review of documents, there were several iterations of subscription documents distributed by Middlebury in 2009 and 2011 on behalf of Navagate. The Navagate Offering began as a $2 million offering but it appears from the subscription documents that the offering was held open and ultimately raised more than $3 million.

(emphasis added).

18. From my review of e-mails sent by GREGORY RORKE, the defendant, to certain investors in the Navagate Offering, I have learned that RORKE repeatedly referenced the Personal Guarantee in soliciting investors in Navagate. For example:

a. In April 2010, an investor ("Navagate Investor-1") invested approximately $50,000 in the Navagate Offering. Approximately two weeks prior to his/her investment, Navagate Investor-1 received an e-mail from RORKE in which RORKE cited his Personal Guarantee as an inducement for the investment, stating that "the biggest reason (outside of my guarantee) is the fact that multiples in this space are 3-8 times revenue."

b. In September 2010, an investor ("Navagate Investor-2") invested approximately $50,000 in the Navagate Offering. In June 2010, when Navagate Investor-2 was considering a potential investment in the Navagate Offering, Navagate Investor-2 received an email from RORKE in which RORKE stated: "I am $250K away from closing my bridge . . . . The returns are very attractive and almost everyone is converting to the full round. As I result, there will be no trouble taking someone out. And I am guaranteeing it."

c. In October 2010, an investor ("Navagate Investor-3") invested approximately $50,000 in the Navagate Offering. Approximately two days prior to his/her investment, Navagate-Investor-3 received an e-mail from RORKE in which RORKE cited the Personal Guarantee as a reason to invest, stating: "I am providing a personal guarantee for the full bridge."

19. From my review of sworn deposition testimony given by Individual-1, I have also learned, among other things, the following:

a. Individual-1 observed that, inasmuch as Navagate did not have a completed company audit at the time of the Navagate Offering, the Personal Guarantee was an essential component of the Navagate Offering as presented by GREGORY RORKE, the defendant.

b. Individual-1 observed RORKE use the Personal Guarantee "as a sales tool," telling potential investors "I'm personally guaranteeing this [investment] . . . I'm putting my stuff in front of it."

-7-

20. From my interviews of certain Navagate investors, I have learned that the Personal Guarantee was significant in the investment decision of certain Navagate investors. For example:

   a. The Personal Guarantee, which Navagate Investor-1 understood to include RORKE's home and bank accounts, all of which Investor-1 understood to be in RORKE's name, was very important to Navagate Investor-1 and was a determinative factor in Investor-1's decision to invest.

   b. In September 2010, an investor and former student of RORKE's at Columbia Business School ("Navagate Investor-4") invested approximately $75,000 in the Navagate Offering after being approached by RORKE. In the course of soliciting Navagate Investor-4 to invest, RORKE told Navagate Investor-4, orally and as confirmed by the Personal Guarantee and accompanying Rorke Financial Statement, that the investment was fully secured by RORKE's personal assets. The Personal Guarantee was significant to Navagate Investor-4 who would not have invested without it.

   c. In October 2010 and February 2011, respectively, an investor ("Navagate Investor-5") invested a total of approximately $100,000 in the Navagate Offering. Navagate Investor-5 learned about the Navagate Offering from Individual-1. Before investing, Navagate Investor-5 reviewed the Personal Guarantee and the Rorke Financial Statement and, based on this review, believed all of the assets RORKE was relying on to guarantee the investment were in RORKE's name. Navagate Investor-5 would not have invested without the Personal Guarantee.

   d. In October 2010, an investor ("Navagate Investor-6") invested approximately $25,000 in the Navagate Offering. Navagate Investor-6 learned about the Navagate Offering from Individual-1. Navagate Investor-6 invested because of the Personal Guarantee, which Navagate Invstor-6 understood to be supported by a financial statement with Rorke's home and assets in excess of $12 million.

<u>RORKE DID NOT OWN THE MAJORITY OF ASSETS PURPORTING TO SUPPORT HIS PERSONAL GUARANTEE</u>

21. From my investigation, including my review of bank documents, as well as my review of sworn deposition testimony given by GREGORY RORKE, the defendant, in October 2013 and March 2014, and by RORKE's spouse (the "Spouse") in January

2014, I have learned that the majority of the assets listed on the Rorke Financial Statement[5] were held solely in the name of the Spouse and not by RORKE.

22. From my review of sworn deposition testimony given by GREGORY RORKE, the defendant, I have learned, among other things, the following:

    a. RORKE acknowledged that the "readily marketable securities" were actually custodied in a U.S. Trust account solely held in the Spouse's name, as was the home/residence, which was worth more than a million dollars.

    b. RORKE acknowledged that he never disclosed to anyone at Middlebury, nor to any investors in the Navagate Offering, that any of the assets on the Financial Statement belonged solely to the Spouse.

23. From my review of sworn deposition testimony given by the Spouse, I have learned, among other things, the following:

    a. The Spouse did not authorize GREGORY RORKE, the defendant, to pledge any of the Spouse's assets to guarantee investments in the Navagate Offering.

    b. The U.S. Trust account purporting to contain assets valued at approximately $5 million (but actually containing approximately $3.6 million) was solely in the Spouse's name.[6]

---

[5] In addition, even if RORKE had disclosed that the Rorke Financial Statement listed the Spouse's assets, which RORKE did not, the statement overstates the value of readily marketable securities by approximately $1.5 million. In his SEC testimony, Individual-1 stated that Middlebury "felt pretty comfortable with the greater than 2 to 1 percent asset ratio." By overstating the Spouse's securities by $1.5 million, the Rorke Financial Statement purported to show approximately $6 million in liquid assets to support an approximately $3 million offering, or a 2:1 ratio, when in truth, it was closer to 1:1.

[6] From reviewing the Spouse's SEC testimony, I have learned that the rules of the trust limited the purposes for which the Spouse could access the trust to "education, medical, living expenses." Of course, and as RORKE well knew, RORKE had no authority to access the trust for any purpose.

c.  The home/residence valued at approximately
$1.4 million was solely in the Spouse's name.

      24.  In fact, from my review of an e-mail sent by
GREGORY RORKE, the defendant, in April 2010, concerning the U.S.
Trust account, I have learned that in response to an e-mail
question from Individual-1 about whether the U.S. Trust account
was "solely in your name or joint" with the Spouse, RORKE
responded that the account was "joint," when in truth, and as
RORKE well knew, the account was solely held by the Spouse.

<u>RORKE REFUSED TO PERFECT THE PERSONAL GUARANTEE</u>

      25.  From my review of sworn deposition testimony
given by Individual-1, I have learned, among other things, the
following:

            a.  In the fall of 2011, after Navagate had
missed certain interest payments owed to investors in the
Navagate Offering, Middlebury requested that GREGORY RORKE, the
defendant, place the assets listed on the Rorke Financial
Statement into an escrow account or "lockbox." RORKE refused.

            b.  When Individual-1 then confronted RORKE
about the fact that the home/residence listed on the Rorke
Financial Statement was in the Spouse's name, asking "isn't that
fraudulent conveyance," RORKE responded, in sum and substance,
"Don't tell me what fraudulent conveyance is.  I teach that at
Columbia."

            c.  Around the same time period, Individual-1
and RORKE spoke about potential lawsuits against RORKE
concerning, among other things, RORKE's failure to fulfill the
Personal Guarantee.  RORKE told Individual-1, in sum and
substance, "[Y]ou would be fools to sue me because you won't get
your money, I'll delay it, delay it, delay it."

<u>RORKE FRAUDULENTLY ALTERED AN ACCOUNT STATEMENT TO MAKE IT
APPEAR THAT RORKE OWNED ASSETS HE DID NOT OWN</u>

      26.  From my review of an e-mail sent by GREGORY
RORKE, the defendant, in July 2012, in response to questions
about the assets in the U.S. Trust account, RORKE attached a
purported May 2012 account statement (the "E-mailed Account
Statement") for the U.S. Trust account, which reflected an
account balance of more than $3.6 million.  The statement did
not reflect either an account number or an account name.

27. I have reviewed the actual May 2012 account statement for the U.S. Trust account (the "Real Account Statement"). From this review, I have learned that the Real Account Statement is identical to the E-mailed Account Statement except that the Real Account Statement contains the Spouse's name and an account number. Other than the missing account name and number, the two versions of the May 2012 U.S. Trust statement are identical.

28. In his SEC testimony, GREGORY RORKE, the defendant, acknowledged that in response to a request from Middlebury for documentation regarding the U.S. Trust account, RORKE sent an e-mail to Middlebury attaching a doctored version of a statement from his wife's U.S. Trust account in which RORKE blacked out his wife's name and the account number.

29. Based on my training, experience, and familiarity with this case, I believe that the E-Mailed Account Statement was fraudulently altered by RORKE to remove the Spouse's name and account number in order to fraudulently misrepresent that the assets in the Rorke Financial Statement were RORKE's own, when in truth and in fact, and as RORKE well knew, the assets were held solely by the Spouse.

### RORKE'S MISSTATEMENTS ABOUT PAYMENT OF NAVAGATE TAX LIABILITIES

30. In connection with the Navagate Offering, the Middlebury Lawyer directed that certain tax lien searches be conducted on Navagate and GREGORY RORKE, the defendant.

31. Based on my review of e-mails exchanged between the Middlebury Lawyer and GREGORY RORKE, the defendant, I have learned, among other things, the following:

    a. In approximately January 2010, the Middlebury Lawyer uncovered more than $500,000 in federal tax liens owed by Navagate. In response to an e-mail inquiry from the Middlebury Lawyer, RORKE responded that the taxes "will be paid by me personally in the next two weeks." Yet in approximately April 2010, the Middlebury Lawyer learned that Navagate's federal tax lien had actually increased, to approximately $1.8 million, including penalties.

    b. In May 2010, RORKE represented to the Middlebury Lawyer and Individual-1 that he had "paid $500k of the approx. $1M of trust fund liabilities. I expect to fund the rest next week. Then I want to schedule out the penalties on a 6 month basis - target $50k per month for 6 months." Following

this statement, the Middlebury Lawyer learned that Navagate's tax liens had actually increased, not decreased.

        c.    In the summer and fall of 2010, RORKE told the Middlebury Lawyer and Individual-1 that RORKE wanted access to investor funds that had been held in an escrow account since the discovery of the increased tax liens. In October 2010, RORKE told the Middlebury Lawyer that he had sent a check for $350,000 "directly to [the] IRS." After the Middlebury Lawyer requested "a copy of the IRS check or a receipt from the bank showing it was paid," the Middlebury Lawyer agreed that if RORKE signed an affidavit attesting that he had paid $350,000 to the Internal Revenue Service ("IRS"), Middlebury would sign an escrow release form giving RORKE access to the investor funds.

        d.    On or about October 22, 2010, RORKE signed a sworn and notarized affidavit (the "Affidavit") representing that he had mailed a $350,000 check to the U.S. Treasury as payment for tax obligations. The Affidavit attached a copy of a personal check (the "IRS Check") drawn on a checking account in the name of the Spouse (the "Spouse's Checking Account") in the amount of $350,000. The Affidavit stated that the tax payment was made in consideration of Middlebury releasing investor funds from the Navagate investor account. Following RORKE's execution of the Affidavit, monies held in escrow were released to RORKE.

        e.    In May 2011, after the Navagate Offering had closed and all investor monies had been received by GREGORY RORKE, the defendant, Individual-1 received a notice of levy from the IRS indicating that the amount of Navagate tax liabilities continued to be as high as it was in 2010 and that no payments had been made.

      32.    Based on my review of bank records relating to the Spouse's Checking Account, I know that the IRS Check was never cashed.

      33.    Based on my review of the subscription documents provided to investors in the Navagate Offering by GREGORY RORKE, the defendant, and Individual-1, I know that at no point in the course of the Offering did the Rorke Financial Statement or any other part of the subscription documents disclose to investors the true amount of Navagate's outstanding tax liabilities.

## RORKE'S FRAUDULENT EMAIL CONCERNING A MULTI-MILLION DOLLAR DEAL WITH HSBC

34. Based on my interviews with certain investors in the Navagate Offering, my review of sworn deposition testimony given by GREGORY RORKE, the defendant, and Individual-1, to the SEC, and my review of e-mails and other communications between RORKE and others, I have learned, among other things, the following:

   a. Beginning in or about 2011, RORKE began referencing to investors a potential agreement between Navagate and HSBC in which HSBC would pay Navagate millions of dollars to use the Agility software program.

   b. In or about November 2012, certain Navagate investors demanded payment of interest owed and return of their principal after Navagate failed to make required interest and/or principal payments. When payment was not made by RORKE, certain investors threatened to sue.

   c. On or about November 28, 2012, RORKE sent an email (the "November 28 Email") to Individual-1 purporting to forward an email from an individual named "B" at HSBC with email address bo@hsbc.com.hk concerning a "License and Software Development Agreement" between HSBC and Navagate. In an email to Individual-1 forwarding the November 28 Email, RORKE states: "I signed and returned. They signed and returned."

   d. The same day, Individual-1 forwarded the November 28 Email to several existing Navagate Investors stating, among other things: "I am pleased to inform you that the HSBC document was signed last evening." Individual-1 further stated: "It has been requested that no one contact HSBC as it would be tortious interference[]. It looks like they are there!"

35. From speaking with a representative of HSBC, I have learned, among other things, that the e-mail address bo@hsbc.com.hk cannot be verified as a valid e-mail address. Among other things, the email address: (a) does not follow the format typically used by HSBC (in which employees' first and last names are included in their email address); and (b) does not appear as a valid address in HSBC's global email directory.

36. Based on my training, experience, and familiarity with this case, I believe that the November 28 Email was fabricated by RORKE in order to, among other things, retain investor funds,

avoid having to make payments of interest and/or principal owed to investors, and to avoid or delay investor lawsuits.

WHEREFORE, deponent prays that a warrant be issued for the arrest of GREGORY RORKE, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_____
ALEXANDER H. KURGANSKY
Special Agent
Federal Bureau of Investigations

Sworn to before me this
29th day of October, 2014

_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK